IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GREGORY TYSON BELOW,

                              Plaintiff,

    v.

C.O. H. PROKNOWER-BROWN,
CAPT. BROWN, WARDEN TIM
HAINES, DARYL FLANNERY,
KURT HOEPER, SGT. LAXTON,
SGT. NOVINSKA, SGT. MATTIE,
SGT. FURRER, C.O. FRIEDRICH,
and WILLIAM BROWN,

                          Defendants.

OPINION AND ORDER

19-cv-31-wmc

---

*Pro se* plaintiff Gregory Tyson Below alleges that (1) a correctional officer at the Wisconsin Secure Program Facility conducted improper pat searches on him, and (2) other staff failed to protect him, then took retaliatory actions against him when he complained. The court granted Below leave to proceed on these claims under the First, Eighth and Fourteenth Amendments, and defendants have now moved for summary judgment, arguing that his claims lack merit.[1]  (Dkt. #70.)  For the following reasons, the court will grant the motion and dismiss this case.

---

[1] Alternatively, defendants claim entitlement to qualified immunity.  However, because the court will dismiss Below's claims on their merits for the reasons stated below, the court need not reach this alternative argument.

UNDISPUTED FACTS[2]

## I. The Parties

Plaintiff Below is incarcerated at Redgranite Correctional Institution, but his claims are based on alleged events at the Wisconsin Secure Program Facility ("WSPF") in 2014. Defendants were all working there at that time, and include former Warden Tim Haines, Institution Complaint Examiner ("ICE") William Brown, Property Officer Phillip Friedrich, Correctional Officers Heidi Brown and Richard Matti, Sergeants Timothy Laxton and Lesa Novinska, and Captains Lebbeus Brown, Darryl Flannery, and Kurt Hoeper.[3]

## II. Officer Brown's Pat Searches of Below on Delta Unit

During the period relevant to this lawsuit, Below was housed on Delta Unit, which has four ranges and staff consisting of one sergeant and four officers not assigned to specific ranges on the unit.

Staff at WSPF are required to perform searches on inmates to prevent contraband from moving into and within the institution, as well as identify evidence of self-inflicted

---

[2] Unless otherwise indicated, the following facts are material and undisputed.  Consistent with its practice, the court has drawn these facts from the parties' proposed findings and the evidence of record viewed in a light most favorable to plaintiff.  *See Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true.").

[3] Although Below also named Sergeant Nicholas Furrer as a defendant, he advised in response to defendants' proposed findings of fact and in his response brief that he no longer wishes to proceed against Furrer, so the court will grant summary judgment in his favor on claims asserted against him.  (Dkt. ##90 at 9; 91 at ¶ 104.)  Moreover, to avoid confusion among the three defendants with the last name "Brown," the court will refer to Correctional Officer Heidi Brown as "Brown" or "Officer Brown," to William Brown as "ICE Brown," and to Lebbeus Brown as "Captain Brown."

injury and assault. Inmates are searched randomly and regularly, and those that move through the institution more frequently are more likely to be searched multiple times within a span of weeks. Pat searches can be conducted anywhere at WSPF, and staff are required to complete five random pat searches per shift. Inmates are also pat searched when they leave and return to their units. It is necessary for staff to pat down the buttock region during a pat search, and it is possible for an officer to graze an inmate's testicles, especially if the inmate moves around during the pat search.

As a correctional officer, Brown participated in annual trainings for pat search and principles of subject control. Generally, Officer Brown is to begin her pat searches by telling an inmate that she is going to conduct a pat search. She then uses bladed hands to search the inmate, which means the hand is flat and rigid with the thumb touching the pointer finger and the fingers pointing straight out. Starting on one side of the upper body, she moves to the upper arm, then to the waistband area. Next, she moves to the lower body with one hand on the inner thigh and one hand on the outer thigh, then repeats the sequence on the other side of the body.

In his complaint, Below alleges that Officer Brown conducted "repeated searches" and had an "on-going history of staff sexual misconduct," and specifically alleges three pat searches in February and March 2014. (Dkt. #1 at 5-6.) At his deposition and in his declaration at summary judgment, Below also attests that Brown pat-searched him as often as two to three times a day, although again the only details he offers are for 3 searches discussed directly below. (Dkt. ##88 at 20:13-21:16; 92 at ¶¶ 3, 7, 16.)

### A. Pat Search on February 25, 2014

Officer Brown conducted a random pat search on Below on February 25, 2014, during a movement of inmates for lunch. After directing Below to hold, Brown conducted a pat search on the top of his clothing. Although Below acknowledges that he is supposed to stand still during a pat search, he admits repositioning himself by walking or moving his legs while Brown was searching his upper body, purportedly so that he would remain in better view of the cameras on the range. (Dkt. #88 at 27:1-23.) Brown noted in Below's behavior log that he had been "confrontational during [the] pat search" and "[h]ad to be told to hold still and face forward." (Dkt. #73-2 at 1.)

That same day, Below complained to Officer Brown about her frequent pat searches, as well as her having touched him on the buttocks during the search. Still, at his deposition, Below testified to his "belie[f]" and "assum[ption]" that Brown used a bladed hand during the search. (Dkt. #88 at 26:12-22.)

### B. Pat Search on March 13, 2014

A little over two weeks later, on March 13, 2014, Officer Brown was at the top of Range 2 monitoring inmate movement. As Below exited the range, Brown again ordered him to stop and hold for a pat search, but he walked past her. After a few feet, Below then stopped, turned around, and walked back towards Brown. Next, he walked slightly past her before stopping and raising his arms. Ultimately, Below complied when Brown ordered him to come back to where she was standing so that she could conduct the search. Brown again conducted the pat search on top of Below's clothing, and Below claims that he felt Brown "chop" and rub his testicles. (Dkt. #88 at 39:1-5.)

4

### C.  Pat Search on March 20, 2014

Six days later, on March 20, 2014, Below was on his way to the law library when Officer Brown once more ordered him to stop for a pat search.  Similar to March 13, Below walked past her before suddenly stopping near the laundry room, turning around, walking back towards her, passing her by again, then stopping near the sergeant's station where he stated that Brown had to search him in view of the cameras.  Brown ordered him to come to where she was already standing, and where there were also cameras, at which point Officer Brown conducted a third pat search on top of Below's clothes within one month.  After Brown began the pat search, Below started repositioning his body, forcing her to step back and order him to stop.   He then walked away from Brown toward the sergeant's station.  At that point, Below asserts that Brown was yelling at him to "come right here" (dkt. #88 at 43:10-20), and admits that he became disruptive (*id.* at 40:21-23).  By that point, Officer Brown specifically recalls that Below was so loud that other staff in the area stopped to see what was going on, including Sergeants Furrer and Laxton.  Below attests that he then told Sergeant Laxton about earlier "improper" pat searches by Brown, and explained to both sergeants that he and Brown were supposed to be separated, but he did not "have the documentation at that time."  (Dkt. #88 at 41:2-14.)  Sergeant Laxton attests that he heard Below being loud and disruptive with Brown and would not stop moving, so he ordered Below to follow Brown's orders.  (Dkt. #76 at ¶ 9.)  Below then allowed Brown to pat search him, during which no sexual contact occurred.

### III.  Below is Denied Access to his Property and a Dental Appointment

Officer Brown later wrote Below a conduct report about the March 20th pat search,

and he was ultimately found guilty of disobeying orders and disruptive conduct, for which he was placed on 30 days of room confinement and was not allowed to leave his cell without specific permission.  Relatedly, on April 11, 2014, Below was on the list to go to the property room to retrieve some of his property, including a typewriter, but when Sergeant Matti came to get Below, Property Officer Friedrich explained via intercom that Below could not leave his cell while on room confinement.  Below further alleges that Officer Brown had heard him an hour before discussing his plan to file a civil lawsuit and a complaint with the Grant County District Attorney about her, and that she had told Friedrich.

Subsequently, Below filed a grievance alleging that he was denied his property in retaliation for his plan to file complaints about Officer Brown.  Friedrich told the ICE who investigated the grievance that Below had received envelopes, and he had items that needed to be "engraved" (checked and marked with the inmate's name and number) in the property room, but that he could not come while on room confinement.  (Dkt. #73-11 at 5.)  Below disputes what Friedrich told the ICE, attesting that two other inmates had been allowed to go to the property room while on room confinement at some point in the past, and that inmates can at least receive property at their cells.  Regardless, the ICE then spoke to the new warden (Warden Haines having left), who gave specific permission for Below to receive his property.  The ICE affirmed Below's complaint "with the modification that the property department provide [him] with his allowed property."  (*Id.*)

On April 18, 2014, Sergeant Novinska also denied Below permission to leave his cell, this time to go to a scheduled dental appointment while on room confinement.  Below

has advanced periodontitis, a gum infection that damages the soft tissue around the teeth, for which he is seen routinely for cleanings to manage this condition.  On March 15, 2014, shortly before his room confinement was imposed, Below had submitted a request for a teeth cleaning, and his dentist responded that he would be seen in a month, but should be patient.  When Below followed up with a second request on April 10, 2014, the dentist further responded that he was at the top of the list and should be seen within a week or two.  However, when Below was called up to be seen on April 18, Novinska blocked Below from going given his ongoing confinement to his cell.

That same day, April 18, Below immediately filed a grievance alleging that his status on room confinement was not a valid basis for Sergeant Novinska to deny him dental treatment.  (Dkt. #73-12 at 6.)  Below also filed a dental service request making the same complaint.  (Dkt. #87-1 at 22.)  Below did not mention any pain in either of these submissions.  Six days later, on April 24, he saw the dentist for an exam and again reported no pain or other problems.  The dentist recommended that Below continue to be seen every three months for dental cleanings to keep his periodontitis stable.  Below's next cleaning was on May 1, and when he later developed a bump on his gums because of his periodontal disease, his dentist prescribed an effective antibiotic treatment.  Below's grievance about Novinska was affirmed on May 9 with the modification that he be scheduled for another dental appointment as soon as possible.  (Dkt. #73-12 at 2.)  He did not submit any dental service requests in 2014 complaining of tooth pain, nor did he have any teeth removed that year.

## IV.  Officer Brown's Incident Reports

In May of 2014, Officer Brown submitted three incident reports about Below.  The reports concerned warnings from two inmates that: (1) he was trying to get other inmates to file grievances against her for inappropriate pat searches; (2) he was trying to recruit inmates to pass letters between inmates about filing these grievances; *and* (3) he was trying to find someone to assault her.  (Dkt. ##73-15; 73-16; 73-17.)  Captain Brown placed Below on temporary lockup status from May 9 through June 11, 2014, when Below was released to a new unit, while these reports were investigated.

## V.  Below's Grievances about Officer Brown

Below also filed inmate grievances, as well as a complaint with the Grant County Sheriff's Department about Officer Brown.  Warden Tim Haines, as well as Captains Hoeper and Flannery, were involved in the subsequent investigations.

### A.  Below's Original February 25 PREA Grievance

Below submitted a grievance about the February 25 pat search, alleging that Officer Brown had "tapped" him on the buttocks.  (Dkt. #73-8 at 10.)  He further alleged that Brown had pat searched him two weeks before and that she had a "history of doing this, and pattin[g] up in the testicle area." (*Id.*)  Below's grievance was forwarded to Warden Tim Haines's office for a determination on whether a violation of the Prison Rape Elimination Act ("PREA") had occurred.  When a grievance is forwarded to the warden for PREA review, it is typically assigned an investigator.  The warden, the security director, and other supervisory staff meet several times a week to discuss open investigations.

8

Captain Hoeper investigated this grievance. Hoeper reviewed Below's February 25th grievance, and a related information request Below sent his unit manager about Brown. He also interviewed Officer Brown. Although Hoeper did not have the authority to separate Below from Brown, he could have recommended their separation to the warden. Here, Hoeper asserts that he did not see any obvious "red flags" signaling that the search was conducted improperly; he also noted that Below's behavior log included a history of difficult interactions with female staff. (Dkt. #81 at ¶¶ 12-13.) Based on this investigation, Hoeper recommended that Below's allegations be deemed unfounded. That recommendation was later adopted, and Below was notified of the result on May 5, 2014.

## B. Brown's Second March 13 PREA Grievance

Below filed a grievance about the March 13 pat search, alleging that Officer Brown "touched [his] testicles" and that he had "tried to turn so the camera was behind" him when Brown stopped him but "[s]he did not agree with that." (Dkt. #73-6 at 18.) Below's grievance was forwarded to the warden's office the next day by ICE Brown, who is married to Officer Brown. Warden Haines again decided against immediately separating Below from Brown pending review, and Captain Flannery investigated Below's grievance. Like Hoeper, Flannery also lacked authority to separate Below and Brown himself, only to make a recommendation to the Warden. Flannery reviewed Below's March 13 grievance, Brown's incident report, and Below's behavior log before interviewing Brown and Below. Flannery concluded that Below's claim of sexual misconduct was frivolous and the underlying issue appeared to be that Below was simply upset about being pat searched.

Flannery's recommendation of dismissal was also adopted, and Below was notified of the result on April 3, 2014.

The parties dispute whether Warden Haines was required to separate Below from Officer Brown immediately on the filing of Below's first grievance about a pat search. Below points to the PREA investigation cover page that states: "Inmates alleging staff sexual misconduct will be separated / protected from further staff sexual assault, retaliation or intimidation." (Dkt. #74-1 at 122.) Warden Haines attests that WSPF "is a relatively small facility with a finite number of staff," so separating an inmate from a staff member pending an investigation is only done for "overtly egregious [allegations], such as allegations of sexual or physical assault or other related crimes," and rarely for issues related to improper pat searches. (Dkt. #79 at ¶ 11.) Warden Haines further attests that he also did not "see any overt red flags" in Below's grievances that would have indicated the kind of improper conduct requiring separation while the investigation was pending, especially considering Below's history of refusing to interact with female staff or of being "difficult to them." (Dkt. #79 at ¶¶ 15-16.) Finally, Below disputes that he has difficulty with female staff in particular, noting instead that he generally does not like taking orders from anyone. (Dkt. #92 at ¶¶ 16, 20.)

## C. Outside Investigations

On May 8, 2014, WSPF requested an outside investigator to investigate Below's claims of improper pat searches. Apparently, this request was prompted by reports that Below was now trying to get other inmates to file complaints about Officer Brown, and because the Grant County Sheriff's Department had initiated its own investigation at

10

Below's request.   Captain Flannery was also assigned to assist the outside PREA investigator.

The outside investigator conducted several interviews, including with Officer Brown with Flannery present and several inmates who alleged that Below had tried to convince them to file false complaints against Brown or that Below had trouble with female officers generally.   The outside investigator and Flannery also interviewed Below, who denied trying to recruit other inmates to file complaints against Brown.   Finally, the outside investigator interviewed two other female correctional officers, who both described experiencing hostility from Below.   After reviewing all the evidence, including the Grant County Sheriff's Department's independent investigation that found no evidence of improper conduct by Officer Brown, the outside investigator also concluded that Below's claims were unfounded.   However, Below contends that all of these investigations were inadequate.

OPINION

A party is entitled to summary judgment if the movant shows (1) no genuine dispute exists as to any material fact, and (2) judgment is appropriate as a matter of law.   Federal Rule of Civil Procedure 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   "Material facts" are those that "might affect the outcome of the suit."   *Anderson*, 477 U.S. at 248.   If the moving party makes a showing that the undisputed evidence establishes their entitlement to judgment beyond reasonable dispute, then to survive summary judgment, the non-moving party must provide contrary evidence "on which the

11

jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252).

## I. Plaintiff's Eighth Amendment Claims

To begin, plaintiff is proceeding on Eighth Amendment claims under three theories of liability. *First*, he alleges that Officer Brown's pat searches were maliciously motivated to humiliate and harass him. *Second*, he alleges that Warden Haines, ICE Brown, Sergeant Laxton, and Captains Hoeper and Flannery each failed to protect him from Officer Brown. *Third*, and finally, he alleges that Sergeant Novinska recklessly disregarded his serious medical need by not permitting him to go to a dental appointment because he was on room confinement. The court will address each type of claim in turn.

## A. Plaintiff's Pat Search Claims

In terms of proceeding to trial, plaintiff's primary claims against Officer Brown for improperly pat searching him present the closest question. Generally, "only those [bodily] searches that are maliciously motivated, unrelated to institutional security, and hence totally without penological justification are considered unconstitutional." *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004). This is because inmate searches are critical to the security of an institution, and prison officials are permitted to touch, pat down, and search a prisoner to determine whether the prisoner is hiding anything dangerous on his person. *Id.* However, a search may violate the Eighth Amendment if it is "conducted in a harassing manner intended to humiliate and inflict psychological pain." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). "An unwanted touching of a person's private parts,

intended to humiliate the victim or gratify the plaintiff's sexual desires, can violate a prisoner's constitutional rights." *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012).

Plaintiff claims that Officer Brown targeted him for pat searches and performed an excessive number of pat searches on him, and more specifically, he claims that her February 25 and March 13 pat searches were sexually assaultive. As an initial matter, however, plaintiff has not substantiated at summary judgment his general assertion that Brown pat searched him too often, or even how often she did. Moreover, plaintiff has not raised specific allegations about how any pat searches were conducted other than the three at issue in this lawsuit. Nor is there any dispute that every correctional officer at WSPF must perform five pat searches per shift, and inmates may also be pat searched whenever they leave or return to their unit. Further, that plaintiff was never found with contraband did not make him exempt from pat searches, or that he was being pat searched frequently by an officer assigned to his unit does not establish Officer Brown or any other officer had an improper motive for searching him.

More concerning are plaintiff's allegations that Officer Brown touched his buttocks during the February 25th pat search and chopped and rubbed his testicles during the March 13th search, albeit over his clothing, briefly and arguably incidentally to a legitimate random search.[4] However, patting the buttock region falls within a proper pat search and

---

[4] As noted above, plaintiff does not claim that the March 20 pat search was sexually assaultive. In his grievance about the February 25th pat search, plaintiff notes that Officer Brown had pat searched him two weeks earlier, and that she has "history of doing this, and pattin[g] up in the testicle area." (Dkt. #73-8 at 10.) But it is unclear whether plaintiff is alleging that the prior pat search was also assaultive, and plaintiff did not state specific allegations in his complaint about a pat search prior to February 25. (Dkt. #1 at 3, 5-6.)

an officer may inadvertently touch an inmate's testicles, especially when an inmate moves during the pat search. Here, plaintiff admits that he tended to reposition himself by moving his legs but attests that he did so only while his upper body was being searched. (Dkt. #88 at 27:4-23, 30:23-31:17; *see* dkt. #73-6 at 18 (plaintiff "tried to turn so the camera was behind" him during the March 13 pat search)).

Perhaps, most importantly, plaintiff did not deny at his deposition that Brown used a bladed hand on February 25 as taught, and his description of a "chop" on March 13, rather than a grab, indicates that Brown was again using a bladed hand per her training. (Dkt. #88 at 26:12-22, 38:24-39:5.) Neither does plaintiff claim that the touching lasted for an unnecessarily long time, nor that Brown made sexual comments during the searches, laughed, or otherwise tried to humiliate him or sexually gratify herself. *See Oliver v. Friedel*, No. 19-C-43, 2021 WL 1017145, at *11 (E.D. Wis. Mar. 17, 2021) (no triable claim where the pat search involved touching plaintiff's buttocks and cuffing his genitals to "make sure [plaintiff] didn't have anything under there," and the officer made no sexual comments nor laughed); *Guerrero v. O'Neil*, No. 19-cv-578-wmc, 2023 WL 3303864, at *3 (W.D. Wis. May 8, 2023) (triable claim where the officer chose to search the plaintiff, inserted his thumb into the crevice of plaintiff's buttocks and mocked plaintiff); *Maus v. Lesatz*, No. 17-cv-65-pp, 2020 WL 1158572, at *5 (E.D. Wis. Mar. 10, 2020) (triable claim where plaintiff was subject to six pat searches where the officer grabbed or felt his genitals for four to seven seconds, suggesting more than incidental contact); *LeFlore'El v. Bouchonville*, No. 11-cv-897-jps, 2013 WL 815985, at *12 (W.D. Wis. Mar. 5, 2013) (triable claim where the officer grabbed plaintiff's penis and squeezed his testicles during

14

a pat search, then patted and squeezed plaintiff's buttocks and stated, "there, was that bad?").

Were there evidence of any overt sexual touching or intent, or of pat searches occurring on a non-random basis over a significant period of time, plaintiff might have grounds to proceed to trial, but the allegations here are far too general and conclusory for a reasonable jury to find defendant Brown liable.  Ultimately, however, Brown's actions concerning just two searches of very limited duration, moment, or frequency, when viewed in the most favorable light and all reasonable inferences to plaintiff, are not sufficient for a jury to find them sexual in nature, or the remaining pat searches harassment.  In fact, in his institutional grievances, plaintiff raises his general allegation of near-daily pat searches only once and in a grievance challenging a *behavior log entry* as false (dkt. #73-14 at 14), which was dismissed because such entries are not subject to review, but does not otherwise point the court to documentation or corroboration of near-daily pat searches in the record beyond that grievance (*see* dkt. #92 at ¶ 3), calling into question whether that broader claim was presented at all.  Thus, Officer Brown is entitled to summary judgment on these claims based on this record.

## B. Plaintiff's Failure to Protect Claims

Plaintiff also contends that Warden Haines, ICE Brown, Sergeant Laxton, and Captains Hoeper and Flannery failed to protect him from Officer Brown after he filed grievances about her pat searches.  To prevail, plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm" and that defendants intentionally ignored that risk.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Plaintiff cannot proceed against any of these defendants on this record.  To begin, Sergeant Laxton did not witness an assaultive pat search by Officer Brown on March 20, and there was no separation order.  As for Warden Haines and Captains Hoeper and Flannery, plaintiff questions the integrity of their investigations and maintains that they should have separated him from Officer Brown once he filed a single grievance about her conducting a pat search improperly.  In fact, although both captains could recommend separation, only the warden had that authority.  More importantly, plaintiff has not established that he was subject to a substantial risk of serious harm from Officer Brown.

In fact, in addition to the two internal investigations conducted by the warden's office, two outside investigations into plaintiff's claims about Brown independently concluded that the claims were unfounded.  In response, plaintiff states that these investigations were all flawed, but his opinion, no matter how sincerely held, is not *evidence* of flawed investigations, much less that the Warden or Captains Hoeper or Flannery were aware of any defects.  Again, had plaintiff's grievances contained more robust evidence of sexual touching or ongoing harassment beyond two short, incidental touchings or of actual, ongoing harassment, this might be a different case.

Plaintiff also repeatedly emphasizes in his brief and in response to defendants' proposed findings of fact that video evidence was not preserved, he does not specify any properly placed request to preserve video for litigation purposes, nor present evidence that any video was destroyed in bad faith for the purpose of hiding adverse information. Plaintiff directs the ICE to video footage in two inmate grievances, and references video in a third.  (Dkt. ##73-8 at 10; 73-10 at 5; 73-14 at 7.)  But the litigation coordinator at

WSPF attests that she has found no record of a proper request to have video retained for litigation purposes from plaintiff and that the video surveillance system in use in 2014 retained video for approximately 5 to 10 days only before recording over it in the regular course of business.  (Dkt. #73 at ¶¶ 45-46.)  Even plaintiff's speculation that video was recorded over is insufficient to establish bad faith.  *See Bracey v. Grondin*, 712 F.3d 1012, 1018-19 (7th Cir. 2013) (discussing when an adverse inference instruction due to the bad-faith destruction of evidence is appropriate).

Plaintiff's related argument that ICE Brown should have preserved video evidence and allowed another ICE to process his grievance about the March 13 pat search is equally unavailing.  ICE Brown did not ignore plaintiff's grievance -- although it concerned ICE Brown's wife, he only did what any ICE could do under the circumstances, which was to forward the grievance to the warden's office for PREA review.  These defendants are entitled to summary judgment on plaintiff's failure-to-protect claims.

## C.  Plaintiff's Medical Care Claim

Plaintiff's medical care claim against Sergeant Novinska requires little discussion. It is well established that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quotation marks and citation omitted).  "This principle applies equally to dental care."  *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).  However, negligence, even gross negligence, does not violate the constitution -- only deliberate indifference or worse in the face of a serious medical need will do.  *Estelle*, 429 U.S. at 103-04.

17

Plaintiff's claim falters on multiple fronts.  To begin, plaintiff has not established that he was experiencing a serious medical need when Sergeant Novinska refused to let him leave his cell to have his teeth cleaned.  On the contrary, plaintiff's periodontitis is chronic, and he had been treating it with routine cleanings since 2013.  Of course, "dental pain accompanied by various degrees of attenuated medical harm may constitute an objectively serious medical need," *Board. v. Farnham*, 394 F.3d 469, 480 (7th Cir. 2005), but plaintiff did not complain of pain or any other problems in requesting the cleaning, in his grievance about Novinska's conduct, or when he saw the dentist just six days later for an exam.  And while he alludes to a bump developing later and attests that it hurt when chewing, nothing in the record suggests that the two-week delay in cleaning in April contributed to the bump or worsened his condition, or otherwise exacerbated any injury or unnecessarily prolonged any acute dental pain.  *See Estelle*, 429 U.S. at 104-05 (intentionally denying or delaying access to medical care can constitute deliberate indifference where the result is the unnecessary and wanton infliction of pain).  Accordingly, Novinska is entitled to summary judgment on this claim.

## II. Plaintiff's First Amendment Retaliation Claims

Plaintiff is also proceeding on retaliation claims against Captain Brown for placing him on temporary lockup status pending the investigation of Officer Brown's incident reports, and against Officers Brown and Matti, and Property Officer Friedrich for denying him access to his typewriter.  None of these claims may proceed to trial either.

To succeed on a retaliation claim, plaintiff must show that:  (1) he engaged in activity protected by the First Amendment; (2) he suffered a consequence likely to deter

First Amendment activity in the future; and (3) the First Amendment activity was a motivating factor in defendant's decision to retaliate. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). However, a defendant cannot be found liable for retaliation where he can show that the claimed deprivation would have occurred even if the alleged retaliatory motive did not exist. *See Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) (quoting *Green v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011)) (a defendant is not liable for retaliation where he can show "that his conduct was not a necessary condition of the harm—the harm would have occurred anyway").

In this case, even if plaintiff could establish all three elements of a retaliation claim as to Property Officer Friedrich and Officers Brown and Matti, the record shows that the results would have been the same even without a retaliatory motive. Specifically, the evidence is overwhelming that Property Officer Friedrich would not have allowed plaintiff to go to the property room while on room confinement because that was in keeping with policy in place at that time. Indeed, under the version of Wis. Admin. Code § DOC 303.72(3) in effect then, an inmate on room confinement could not leave his quarters without "specific permission," which only the warden could grant. (Dkt. #73-11 at 2.) Here, plaintiff's inmate grievance about this incident alerted the warden to the problem, and the new warden gave the specific permission for him to go to the property office consistent with the administrative code. (*Id.*) That inmates on room confinement are now allowed to go to the property room, and plaintiff's recollection of two other inmates being allowed to retrieve property while on room confinement, and his assertions of inmates being allowed to receive property at their cells, do not overcome the fact that Friedrich was

19

following the rule then in place.  Regardless, plaintiff has shown no consequence or injury from the short delay in getting access to his property.  Accordingly, Friedrich, Matti, and Officer Brown are entitled to summary judgment on plaintiff's retaliation claims against them as well.

As for Captain Brown, there is no evidence of a retaliatory motive whatsoever. Rather, he responded to evidence that plaintiff was potentially planning to harm Officer Brown.  Whether true or not, two inmates had also reported that plaintiff was trying to recruit inmates to file grievances against Brown *and* to find someone willing to assault her. Plaintiff maintains that these inmates should not be believed, but he gives no credible reason why Captain Brown should have completely discounted this information when he received it, much less that it was a constitutional violation to take the multiple reports seriously.  Thus, Captain Brown's decision to place plaintiff on temporary lockup status pending the investigation of Officer Brown's incident reports had an obviously legitimate security and safety basis, and he is also entitled to summary judgment on plaintiff's retaliation claim against him.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #70) is GRANTED and plaintiff's claims are DISMISSED with prejudice.

2) Plaintiff's motion to compel (dkt. #104) is DENIED as moot.

3)  The clerk's office is directed to enter judgment in favor of defendants and to close this case.

Entered this 8th day of August, 2023.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge